Louise Noel MALACHOWSKI, Nancy Noel Kosene, H. Jerome Noel, Jr., Irma Noel Rand, William H. Noel, Carol Noel Madrick, William H. Failey, Jr., and John Noel Failey, Appellants (Plaintiffs Below),

v.

BANK ONE, INDIANAPOLIS, formerly American Fletcher National Bank and Trust Company, Appellee (Defendant Below).

No. 49A03–9005–CV–284.

Court of Appeals of Indiana, Third District.

April 22, 1991.

Rehearing Denied June 10, 1991.

Henry J. Price, Jennifer L. Graham, Price & Shula, Indianapolis, for appellants.

Richard E. Deer, Arend J. Abel, Teresa E. Morton, Barnes & Thornburg, Indianapolis, for appellee.

HOFFMAN, Presiding Judge.

Plaintiffs–Appellants appeal from the trial court's grant of summary judgment to defendant-appellee Bank One.

The facts relevant to this appeal reveal that appellants are some, but not all, of the adult income beneficiaries of an irrevocable inter vivos trust. Bank One is the trustee of the trust.

In 1935, the irrevocable inter vivos trust was established by Harry S. Noel, naming Bank One's predecessor as trustee. Originally, the trust held the settlor's life insurance policies. The trustee was directed to hold the policies and then, upon the settlor's death, to collect and receive the proceeds and to hold, manage, invest, and reinvest the proceeds. The trustee was given the discretion to purchase property from the executor of the settlor's will or from the trustee under any trust established by settlor's will.

Upon the settlor's death, the income from the trust was to be paid to Nellie C. Noel, the settlor's spouse, during her lifetime. Upon her death, the income was to be paid in equal shares to the settlor's three children, Harry J. Noel, Barbara L. Noel, and Carol A. Noel, or their surviving issue. The trust is to terminate on the death of the survivor of the settlor's three children, with the corpus to be delivered to the surviving issue of those three children, if any, or to the personal representatives of the children.

Harry S. Noel, the settlor, died in 1943, survived by the three children named in the trust. Harry J. Noel died in 1986, leaving six children, H. Jerome Noel, Jr., Nancy Noel (Kosene), William H. Noel, Carol Noel (Madrick), Louise Noel (Malachowski), and Irma Noel (Rand), all of whom are plaintiffs in this action. Carol A. Noel (Failey) died in 1961, leaving two children, John Noel Failey and William H. Failey, Jr., also plaintiffs in this case. Barbara L. Noel (Seawell) is still living, and has two children. Neither Mrs. Seawell nor her children are parties to this action.

Harry S. Noel also established a testamentary trust in his Last Will and Testament executed February 28, 1942. Upon the settlor's death in 1943, the testamentary trust provided income to his wife during her lifetime. Upon her death, the corpus of the testamentary trust was to be divided into three equal shares, to be held and administered for the use and benefit of each of the testator's three named children. The testator's children were to receive distributions of corpus upon their attaining certain ages. The trust terminated upon the last of these distributions between 15 and 20 years ago.

After the settlor's death, his estate was advanced funds by the inter vivos trust to pay the taxes. After the estate was closed, the testamentary trustee assumed the estate's obligation to repay the loan. The loan was repaid via a transfer of 1,564 shares of Eli Lilly & Company stock.

From that time until 1972, the corpus of the inter vivos trust consisted entirely of Eli Lilly & Company stock. In October 1970, Mr. Garrett Boss of the bank suggested to the beneficiaries that a program of diversifying should be considered. Mr. Boss asserted that the Trust Investment Committee had discussed the concentration of Eli Lilly stock in the account and suggested a gradual diversification. Harry S. Noel met with the trustee to protest diversification. The trustee notified Harry Noel on November 6, 1970 that it might be possible to work out an indemnification agreement that would be satisfactory to the bank and Noel. Harry Noel responded asking the bank if it would be possible to split the trust if all the beneficiaries would not sign an indemnification agreement.

On December 2, 1970, the bank sent Harry Noel an indemnification agreement to be signed by all the beneficiaries. This indemnification agreement would hold the bank harmless from any loss resulting from the bank's retention of the stock. However, the agreement also stated that the indemnity was not to be construed as imposing a contractual liability upon the bank to retain the stock if it should determine that all or any of the stock should be sold despite the indemnity.

On December 10, 1970, an attorney representing H. Jerome Noel and Barbara (Noel) Seawell wrote Garrett Boss contending that the suggestion of diversification had been met with "considerable concern" as this was the first suggestion that the holding of the Lilly stock was not in the interest of the beneficiaries considering that the investment was placed in trust at an approximate value of $35,000.00 which had increased in value in excess of $1,800,-000.00. The attorney stated that he could not permit his clients to sign the agreement since he felt it was "entirely written in the interest of the bank."

An internal bank memorandum written November 18, 1971 by trust officer Thomas Jenkins reveals the bank's position that the account should either be diversified or that the beneficiaries hold it harmless for any loss attributable to non-diversification. It is noted that H. Jerome Noel is strongly opposed to diversification and Barbara Seawell will not provide the requisite indemni-

fication. The plan was to go forward with gradual liquidation of Lilly stock, over an approximate five-year period, to obtain a goal of approximately 50% concentration. On November 19, 1971, Thomas Jenkins wrote two beneficiaries declaring that the bank had been "mandated by the National Bank Examiners audit staff and by our own Internal Trust Committee to either diversify this concentration of Lilly stock or seek indemnity from all interested parties against any loss due to its retention."

Thomas Jenkins again wrote a letter on March 30, 1972 requesting indemnification. If indemnification was not received by May 15, 1972 the account would be diversified. Harry Noel replied asking for a 30–day extension of the deadline. He felt that all beneficiaries were opposed to diversification except for his sister, Barbara. The extension was granted by the bank. However, Harry Noel's sister never signed the indemnification and diversification began on June 29, 1972.

In January 1980, Barbara Seawell, the lone dissenter to signing the indemnification, wrote the bank asking that diversification now be discontinued. Diversification was stopped.

A letter from Laurence Hulbert, trust officer, written to H. Jerome Noel on August 14, 1984 reflects a request by H. Jerome Noel to diversify the trust by selling shares of the Lilly stock. The stock was again sold on August 28, 1984 and continued until December 3, 1985.

In September 1985, Laurence Hulbert sent an annual investment review to the beneficiaries. Hulbert stated that the principal value of the account had increased by $356,642.00, or an increase of 18.93%. If the bank had not sold Lilly stock, "based soley on the increased value in Lilly common stock, the account would of [sic] increased in value by approximately $360,-000.00 more." Hulbert further averred:

"However, as I think you will agree we had to make the diversification at some time. . . .
With the sale of $11,500.00 shares of Lilly during the past year, we have managed to lower the concentration of Lilly in the trust portfolio, to meet our policy maximum level of 25% in any one investment.
I still recommend that we continue to lower concentration on Lilly so that any adverse turn in that one issue does not dramatically affect the total value of the trust. . . . As it stands right now the ownership of Lilly represents 56.3% of the total common stock portfolio."

H. Jerome Noel died in November 1986. H. Jerome Noel, Jr., wrote to the bank in June 1987 requesting information regarding the account. In response, David Ayers, trust officer, wrote to H. Jerome Noel, Jr., on July 2, 1987. In providing an analysis of the account, Ayers divulged that "[t]here is no documentation from Federal Bank Examiners involving the account which is in the account file." Upon further investigation into the alleged mandate from the Federal Bank Examiners to diversify the account as told to the beneficiaries in 1971 by Thomas Jenkins, the appellants received a Certification of Non–Existence from the Comptroller of Currency in September 1989 stating that no order or mandate to the bank requiring it to diversify had been issued.

The appellants filed their complaint against the bank on February 19, 1988. The amended complaint sought an accounting, removal of Bank One as trustee and restoration of Eli Lilly stock to ⅔ of the trust.

The bank filed for summary judgment in July 1989. After hearing oral argument and taking evidence, the trial court, in granting summary judgment to the bank, held that the bank had not violated any terms of the trust nor had it breached its fiduciary duty in selling Lilly stock and refusing to divide the trust into separate portions.

One issue is dispositive of this appeal: whether the appellants' claims are barred by the statute of limitations.

The bank raised this issue at the trial court level. In rendering its decision, the trial court did not address the issue of statute of limitations. However summary

judgment may be affirmed by an appellate court if sustainable on any theory or basis found in the record. *Wingett v. Teledyne Industries, Inc.* (1985), Ind., 479 N.E.2d 51, 56.

The appellants' claims of breach of trust resulting in injury to the trust res are governed by IND.CODE § 34-1-2-2(1) (1988). This section provides in relevant part:

> "The following actions shall be commenced within the periods herein prescribed after the cause of action has accrued, and not afterwards: (1) For injuries to person or character, *for injuries to personal property*, and for a forfeiture of penalty given by statute, *within two (2) years ....*" [Emphasis added.]

*See: Mack v. American Fletcher Nat. Bank* (1987), Ind.App., 510 N.E.2d 725, 738-739 (an injury to a trust interest is an injury to personal property).

The appellants' alleged injuries occurred when the bank sold the Lilly stock as part of the diversification plan. These sales occurred from June 1972 to December 1985. Thus, the two-year statutory period for appellants bringing an action expired no later than December 1987. As stated above in the facts, the appellants' complaint was filed on February 22, 1988. Therefore, in accordance with IND.CODE § 34-1-2-2(1), appellants' claims are barred.

Appellants, however, raise the equitable doctrine of fraudulent concealment which tolls the statute of limitations. The "doctrine of fraudulent concealment ... operates as an equitable doctrine to estop a defendant from asserting a statute of limitations when he has, either by deception or by a violation of a duty, concealed from the plaintiff material facts thereby preventing the plaintiff from discovering a potential cause of action." *Burks v. Rushmore* (1989), Ind., 534 N.E.2d 1101, 1104.

In this case a fiduciary duty existed between trustee and beneficiary. The trustee had the duty to disclose material information with the beneficiaries. Under the doctrine of fraudulent concealment, the failure to speak when there is a duty to disclose will toll the running of the statute of limitations. *Lambert v. Stark* (1985), Ind.App., 484 N.E.2d 630, 632. However, there must also be evidence that reasonable care and due diligence were used to detect the alleged fraud. *Id.* It is on this latter point that the Bank is entitled to summary judgment. The undisputed facts in this case show that reasonable care and due diligence were not used to detect the alleged fraud.

Appellants simply allege that the statute of limitations should not begin running until 1987, since they did not discover the fraud until that time. They contend it was not until they requested the Bank to produce the 1971 mandate from the Federal Bank Examiners ordering the Bank to diversify and the Bank notified them in July, 1987 that a mandate could not be produced, that they discovered the fraud. However, the Bank had been diversifying the account since 1972. As the facts show, during this time period some of the beneficiaries had been concerned about diversification and even protested it, but took no steps to question the mandate.

Furthermore, the facts reveal that the Bank stopped diversification in January 1980 when the lone dissenter to signing the indemnification agreement requested diversification be discontinued. Clearly, the Bank stopped diversification upon request even though no indemnification agreement was executed.[1] Additionally, diversification was started again in 1984 when one of the beneficiaries requested diversification. The Bank's conduct in stopping diversification in 1980 upon request and starting diversification in 1984 upon request without any indemnification agreements surely

---

**1.** Despite appellants' contention in their brief that "all beneficiaries signed the requested indemnity in 1980," appellants do not provide a cite in the record to this indemnification agreement signed by all the beneficiaries. In fact, there is no evidence in the record to support this contention. The record only shows that in 1980 Barbara Seawell, the lone dissenter, sent a letter to the Bank requesting that diversification be discontinued.

would place a reasonable person on notice that there was no mandate to diversify.

The undisputed facts in this case show no reasonable care and due diligence were used by the beneficiaries to detect the alleged fraud. Therefore, since there is no genuine issue of material fact, the Bank is entitled to summary judgment on the basis that the appellants' claims are barred by the statute of limitations.

■ Appellants also argue that the claims of H. Jerome Noel's children are not time barred since his death was in November 1986. They believe that the statute of limitations did not begin to run for them until their father's death. However, as stated in *Mack*, third parties are usually held accountable for the time running against their predecessors in interest. *Mack, supra*, at 734. As in *Mack*, the alleged damage was to the value of the trust res and therefore, the beneficiaries' interest was ascertainable at that time. *Id.* The statute of limitations began to run for all beneficiaries when the trust res was allegedly damaged.

Affirmed.

SHIELDS, J., concurs.

SULLIVAN, J., dissents in part and concurs in part with opinion.

SULLIVAN, Judge, dissenting in part and concurring in part.

Our standard of review for summary judgments is well settled. Suffice it to say that any doubts as to the existence of an issue of fact are to be resolved in favor of the non-moving party.

In the case before us we are concerned not only with the alleged monetary loss sustained by the beneficiaries as a result of the diversification decision by the Bank, but also the aspect of the summary judgment which denied the request that the Bank be removed as trustee. The latter question is not necessarily answered by holding that as to the statute of limitations question, there was no genuine issue of fact as to a breach of fiduciary duty in selling Lilly stock. A trier of fact may have been permitted to determine from the evidence that in making misrepresentations to the beneficiaries as to federal examiners' orders to diversify, the Bank had so jeopardized its trust relationship as to require removal. With or without regard to the misrepresentation, the diversification decision was either an appropriate investment decision or it was not. The arguable fraud, however, may or may not impact upon whether the Bank should remain in the position of trust.

I agree that the two year statute of limitations bars the claim of the beneficiaries with regard to sales of Lilly stock. It would appear that the last sale of Lilly stock occurred in December 1985. The complaint was not filed until February 22, 1988, more than two years later. I do not, however, agree that the alleged fraud or the failure of the beneficiaries to discover it is particularly meaningful. As earlier stated, the diversification was either a sound investment decision or it was not. That is the question, the answer to which determines whether there was a viable cause of action or not. The misrepresentation as to a federal impetus for diversification relates to the Bank's possible desire to disguise the true motivation for the diversification but it does not change what might have been a valid investment decision into an invalid one.

The beneficiaries' claim of estoppel so as to toll running of the statute of limitations, is misplaced. The alleged concealment concerned the reason for the Bank's decision to sell Lilly stock. There was no concealment as to the various sales themselves; and it is these transactions which triggered the running of the statute. The fact of the sales was not concealed. The statute of limitations was not tolled by the "concealment" as alleged.

Nevertheless, I disagree with the majority in its conclusion that the beneficiaries were under some duty to use diligence and to earlier discover that there was no federal mandate to sell. This view would seem to undercut the very essence of a trust relationship. It would appear to say that persons are not entitled to rely upon the

good faith of a fiduciary but are required to be suspicious of every act or statement made.

I fully agree with the majority in its conclusion that the protracted discussions between the Bank and beneficiaries about an indemnification agreement were wholly meaningless. The Bank clearly took the position that even had all adult beneficiaries signed such an agreement, it would have created any contractual obligation on the Bank to retain the stock if the Bank determined that all or any part of it should be sold. The hold harmless provision would have been of import only if the Bank had not diversified and, as a result, the trust sustained loss. The indemnity matter was clearly not critical or even a meaningful factor with regard to the diversification.

For the reasons set forth, I concur in the affirmance of the summary judgment as to the claim for monetary loss by the beneficiaries but dissent and would remand to the trial court for reconsideration of the continued or continuing status of the Bank as trustee.